1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10
11  KOMOA GREENE,                      )    Case No. 12CV1824-BEN (BLM)
                                       )
12              Petitioner,            )    **REPORT AND RECOMMENDATION**
    v.                                 )    **FOR ORDER DENYING PETITION**
13                                     )    **FOR WRIT OF HABEAS CORPUS**
    D.K. JOHNSON, Warden,              )
14                                     )
                Respondent.            )
15  _____        )
16
17          This Report and Recommendation is submitted to United States District Court Judge Roger

18  T. Benitez pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United

19  States District Court for the Southern District of California.  On July 23, 2012, Petitioner Komoa

20  Greene, a state prisoner who is proceeding *pro se* and *in forma pauperis*, commenced these

21  habeas corpus proceedings pursuant to 28. U.S.C. § 2254.  ECF No. 1. ("Pet.").  Petitioner

22  challenges her conviction of first degree murder with a firearm allegation.  Id. at 2 and ECF No.

23  10 ("Answer") at 2.  Respondent filed an answer on November 15, 2012 and Petitioner did not

24  file a traverse[1].  ECF Nos. 7.

25          This Court has considered the Petition, Answer, and all supporting documents filed by the

26  parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for

27  Writ of Habeas Corpus be **DENIED**.

28  _____

               [1]Petitioner's traverse was due to be filed on or before December 17, 2012.  ECF No. 9.

## **FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are taken from the California Court of Appeal's opinion in People v. Greene, Appeal No. D057657, slip op. (Cal. Ct. of App. Feb. 28, 2012).  Lodgment 12.  This Court presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

> The charges against Greene arose from the murder of Patricia Lopez, who was shot at about 10:20 p.m. on October 1, 1994, while she and a friend were being robbed as they walked home from a store. The prosecution's evidence showed that on the night of the shooting, Greene and several other individuals (including Khary Watson and Tyrone Katrel Lynch) were driving around looking for robbery victims. Greene was the driver, and she provided a gun for Watson and Lynch to use to threaten the victims. During the robbery, Watson shot Lopez while Greene was waiting in the car.

> The murder remained unsolved for many years, until in 2006 the police received an anonymous phone call from a man (later identified as Greene's former boyfriend, Maurice McGuire) who stated that Greene and Lynch were involved. After the receipt of this anonymous call, the police contacted Greene and thereafter met with her on several occasions to discuss the crime. Greene's ineffective assistance claims pertain to two of these meetings: (1) a meeting on June 29, 2007, at which she was promised use immunity (the use-immunity meeting), and (2) a meeting on April 18, 2008, at which she was interviewed at the crime scene (the crime scene interview).

> At Greene's trial, the evidence presented by the prosecution included incriminating testimony from Lynch (who had reached a plea agreement); the testimony of Dominic Holmes (a friend with whom Lynch discussed the crime); McGuire's testimony; and admissions made by Greene to an investigating agent during the recorded crime scene interview.

> According to Lynch, on the night of the shooting, he, Greene, Watson, and another friend (Alfonzo Frazier) started talking about not having any money; Greene brought up the idea of snatching a purse or robbing someone; and they all agreed to do this. Greene had a .25-caliber gun with her and she gave it to either Lynch or Watson so they could point it at the victim and make the robbery easier. FN2 They planned to split the proceeds of the robbery.

> FN2. Lynch testified that he could not remember if Greene handed the gun to him, and he then gave it to Watson, or whether Greene handed the gun directly to Watson.

> Lynch testified that they engaged in two robberies that night. During the first robbery, Greene drove them to the location, and Watson got out of the car by himself with the gun and approached a car in an alley. Lynch thought Watson was

taking too long, so he got out of Greene's car, went to the alley, and told Watson to " 'come on.' " When Watson and Lynch got back in the car, Watson said he had gotten $6.00. They agreed it was not enough money, and decided to try again. Greene drove them to a street near El Cajon Boulevard, and Watson and Lynch got out of the car and started walking towards El Cajon Boulevard looking for a victim.

Lynch and Watson saw two women walking on the street. Watson grabbed one of the women (murder victim Lopez), and Lynch looked around to make sure they would not get caught. While Lynch was looking at a woman who was outside on her balcony, Lynch heard screaming and then heard a gunshot. When he turned around, Lynch saw Watson bent down in the grass.

Lynch and Watson ran to Greene's car. When they got in the car, Watson said he " 'got the shell casing,' " and Greene asked him " 'Why did you shoot?' " Watson responded, " 'The bitch bit me.' " FN3 Watson had retrieved a waist pouch from one of the victims, and he told the others there was "nothing in there." Greene did not believe it, and she also looked through the pouch and said there was nothing there. FN4

FN3. The prosecution also introduced a recording of a conversation between Lynch and Watson while they were incarcerated together, during which Lynch tried to convince Watson to tell the police that he was responsible for the shooting.

FN4. The pouch contained less than a dollar in change and a few other items.

At the time, Lynch did not know whether Watson had actually shot someone, or whether he had just shot in the air or the ground. Greene drove them to Lynch's home and they went their separate ways. Lynch believed that by this point the gun had been returned to Greene. The next day Greene came to see Lynch; she was crying and she told him that she heard on the news that someone had been killed. She stated she wanted to send flowers to the family, but Lynch told her she should not do this because she was involved.

Lynch's friend (Holmes) testified that in 1994, Lynch told him that he, Greene, and Watson were "out stealing purses"; Greene was the driver; and during the robbery Watson shot someone. Holmes (who had met Greene through Lynch) testified that in 1994 Greene had shown him her .25-caliber gun, and he saw her put it in her purse. FN5

FN5. However, Holmes testified that he thought Lynch told him the gun used in the shooting belonged to Watson.

Greene's former boyfriend (McGuire) testified that when he was living with Greene in 1994, she would cry whenever a news report came on the television about the woman getting shot on El Cajon Boulevard. Greene told McGuire that she had been with Lynch and another man; they were "going around ... looking for people to rob"; she parked around the corner and waited in the car for them to come back; and she did not know a lady had been killed until later. Greene was upset because during the robbery "something went bad and it did not go the way it was supposed to." She told McGuire that "she gave them the gun and they did what they did." She showed McGuire the gun that was used in the shooting, and they later sold the gun to McGuire's friend.

During their investigation of the case, the authorities determined that four days before the October 1, 1994 shooting, Greene had retrieved from the police

impound department a .25-caliber Lorcin pistol that was registered to her and that had been previously seized from her residence in an unrelated matter. A bullet recovered at the scene of the shooting was a .25-caliber bullet that could have been fired from a .25-caliber Lorcin pistol.

The incriminating statements underlying Green's ineffective representation claim were made during a recorded, voluntary interview at the crime scene on April 18, 2008. The individuals present during this interview were Greene, Greene's retained pretrial counsel, an agent from the Federal Bureau of Investigation (FBI) who was working with the San Diego police department on cold homicide cases, and a detective. Greene's pretrial counsel also made incriminating statements explaining Greene's version of the facts to the police; these statements were admitted at trial for consideration as adoptive admissions.

During the recorded interview, Greene stated that during the first robbery, Watson and Lynch got out of the car, and when they returned to the car they stated they did not "net anything." FN6 Greene told Watson and Lynch they were stupid and she was taking them home. However, as she was driving Watson yelled at her to let him out, and when he and Lynch got out of the car she assumed they were going to try to commit another robbery. While they were gone she heard a gunshot, and then they came running back to the car. In conversations between Watson and Lynch, Watson stated that he picked up the shell casing and the reason he shot the lady was because she bit him.

FN6. It is not clear whether Greene was admitting that she knew about the first robbery before it occurred. When the FBI agent asked how the first robbery occurred, Greene stated she did not remember. When the agent summarized her statement by stating, "they were out robbing people earlier in the night," Greene responded, "I didn't say they was out ... I don't know. I just remember this one and ... the incident that happened over there, but I don't know about - I have no knowledge of, that's that what the intent was or whatever for over there." Later during the interview, Greene's pretrial counsel stated that Greene was with Watson and Lynch during the first robbery but "she was just a party to it."

In closing arguments, the prosecutor stated that Greene had "fessed up" to the first robbery. Defense counsel stated that perhaps Watson and Lynch committed the first robbery "by themselves," but even if Greene "may have participated" in the first robbery this did not mean she agreed to commit the second robbery.

Greene claimed she did not know Watson and Lynch were armed. She stated she did not give them her gun and did not tell them to do anything, although she now recognized they probably took her gun from her apartment. She said that she thought they would commit the robbery without a weapon, for example by snatching a purse or demanding a wallet. She explained she did not like Watson because he did "stupid stuff," and she would have left Watson there after he got out of the car if Lynch had not gone with him.

After Greene heard about the shooting on the news and she told Lynch she wanted to send the family flowers, he told her that would be stupid because she would get everyone "caught up." Lynch returned the gun to her and she gave it to McGuire who then sold it.

Jury Verdict and Sentence

Greene was tried on the theory that she aided and abetted a robbery, and that she

1        was guilty of first degree murder under the felony-murder rule. The jury convicted
2        her of first degree murder, with a finding that a principal was armed with a
    firearm. She was sentenced to 25 years to life, plus a one-year sentence for the
3        firearm enhancement.

4    Lodgment 12 at 2-8.

5        On June 22, 2009, the People of the State of California filed an amended information

6    charging Petitioner with murder, voluntary manslaughter, robbery, and attempted robbery.

7    Lodgment 2 at 7-9. Following a trial, the jury found Petitioner guilty of first degree murder. Id.

8    at 133. The jury also found true an allegation that "at the time of the commission and attempted

9    commission of the offense, [Petitioner] was vicariously armed with a firearm, to wit a handgun,

10   within the meaning of Penal Code section 12022(a)(1)." Id. On June 29, 2010, the trial judge

11   sentenced Petitioner to an indeterminate term of twenty-five years to life plus one year for the

12   firearm allegation. Id. at 204.

13       Petitioner appealed her conviction, arguing that (1) she was not provided effective

14   assistance of counsel when her (a) *pretrial* counsel breached her privilege against self

15   incrimination and discussed his confidential communications with Petitioner during the crime

16   scene interview with police and failed to ensure that Petitioner was granted use immunity

17   protection for the incriminating statements and (b) when her *trial* counsel failed to move to

18   exclude the incriminating statements made by her *pretrial* counsel or submit a limiting instruction

19   and failed to move to exclude evidence derived from a meeting where Petitioner was given use-

20   immunity protection, (2) the prosecution engaged in prosecutorial misconduct during closing

21   arguments when the prosecutor misstated the law with respect to the intent required by an aider

22   and abettor, (3) the imposition of a $10,000 restitution fine had to be stricken because it violated

23   ex post facto principles, and (4) the abstract of judgment needed to be corrected because it did

24   not conform with the order of the court at sentencing. Lodgment 4 at 12-46 & Lodgment 12 at

25   8-29. On June 27, 2011, Petitioner filed a petition for writ of habeas corpus in the Court of

26   Appeal alleging due process violations stemming from the ineffective assistance of counsel claims

27   presented in her appeal. Lodgment 7. The direct appeal and petition for writ of habeas corpus

28   were consolidated by the court on July 28, 2011 [lodgment 8] and on February 28, 2012, the

12CV1824-BEN (BLM)

court of appeal published a written opinion affirming the judgment of the trial court, but modified the judgment to remove the erroneous restitution fine and correct the abstract of judgment. Lodgment 12.

On April 6, 2012, Petitioner filed a Petition for Review in the California Supreme Court reasserting the same three claims. Lodgment 13.  On May 11, 2012, the California Supreme Court summarily denied the petition for review without citation or authority.  Lodgment 14.

## SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (West 2012).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West 2012).  In making this determination, a court may consider a lower court's analysis. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision).  Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 131 S.Ct. 770, 784-785 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Id. at 75-76 (emphasis added) (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, 131 S.Ct. at 786. In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (1996); Wood v. Allen, 130 S.Ct. 841, 845 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 340;

12CV1824-BEN (BLM)

see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-474 (2007).

## DISCUSSION

Petitioner raises three grounds for relief in her Petition. Pet. First, she contends that she "was denied the effective assistance of counsel when her former counsel abdicated her privilege against self incrimination [and] disclosed confidential communications implicating [Petitioner] in the offense." Id. at 6. Next, Petitioner contends that she "was denied []effective assistance of counsel and due process because the evidence presented against her was derived from her free talk agreement." Id. at 8. Finally, Petitioner alleges that she was denied due process and a fair trial when the "[p]rosecutor misled the jury by arguing that [Petitioner] did not NEED to intend that a robbery be committed in order to be convicted of felony murder." Id. at 7, 14-16 (emphasis in original). Respondent contends that Petitioner is not entitled to relief because the state court's determination of Petitioner's case was objectively reasonable. Answer.

**A.    Ineffective Assistance of Counsel**

1.    Statements by Petitioner and Petitioner's Counsel as Adoptive Admissions at Trial

Petitioner argues that she was denied effective assistance of counsel when her pretrial counsel "failed to protect her privilege against self-incrimination [and] breached confidential communications . . . when he made admissions implicating [Petitioner]." Pet. at 6. Petitioner further argues that she was denied effective assistance of counsel and due process when her "trial counsel failed to object, move to exclude or to limit the admission of [her] statements [,] former counsel's statements[, or] to submit a jury instruction informing the jury to disregard [Petitioner's] former counsel's statements." Id.

Respondent contends that Petitioner fails to state a claim for ineffective assistance of counsel and that she was not prejudiced by her counsel's actions. Answer at 13-14. Further, Respondent notes that Petitioner has failed to demonstrate that the state court applied the

relevant law to the facts of her case in an objectively unreasonable manner.   Id. at 14.

Petitioner presented her first claim to the state supreme court in a petition for review. Lodgment 13.  The petition for review was summarily denied without a statement of reasoning or citation of authority. Lodgment 14.  Petitioner presented this claim to the appellate court in the same manner as it was presented to the state supreme court.  Lodgment 4.  The appellate court denied the claim in a reasoned opinion.  Lodgment 12.  The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion.  Ylst, 501 U.S. at 804.

Initially, the court considered whether Greene had a constitutional right to counsel at the time the incriminating statements were made.  Lodgment 12 at 13-15.  As the court correctly stated, a "defendant cannot raise a claim of constitutional ineffective assistance of counsel unless the defendant had a right to counsel at the time of the allegedly deficient performance."  Id. at 13 (citing Wainright v. Torna, 455 U.S. 586, 587-588 (1982)).  The court then explained that although a defendant generally is not entitled to counsel before charges are filed, there were aspects of the interview that may have warranted the application of the right to counsel.  Id. Ultimately, the court declined to resolve this issue and decided the claim using a prejudice analysis.[2]  Id.  In that regard, the court stated:

> Assuming arguendo the right to counsel attached at the time of the crime scene interview, we agree with Greene that reasonably competent counsel would have advised her not to make any admissions (and would not have himself made admissions) unless the statements could not be used against her in the event the case went to trial. (See People v. Cummings (1993) 4 Cal.4th 1233, 1315-1318, 1340-1341.)
>
> In a declaration submitted with Greene's habeas petition, her pretrial counsel states that he knew there was no " 'free talk' " agreement for the crime scene interview; he and Greene participated in the interview because he thought this might result in a better disposition of the case; and he did not consider that if no such disposition was reached her statements (and his statements as adoptive

---

[2]

Because the state court did not base its decision on this issue, this Court declines to do so as well.  However, the Court does note that because the United States Supreme Court has not held that the Sixth Amendment right to effective assistance of counsel attaches to proceedings occurring before a person is charged with a crime, the state court's decision would not have justified habeas relief.  United States v. Gouveia, 467 U.S. 180, 187-188 (1984).

admissions) could be used to incriminate her. Greene has also submitted a declaration from an experienced criminal defense attorney opining that it is below the standard of care, and there is no possible tactical reason, for counsel in this case to allow the defendant to be interviewed by the police without protecting the defendant's privilege against self-incrimination, for counsel to make statements to the police incriminating the defendant, and for trial counsel to fail to move to exclude the admissions at trial.

The constitutional privilege against self-incrimination places the burden on the government to produce evidence showing a defendant's guilt " 'by its own independent labors, rather than by the cruel, simple expedient of compelling [the evidence] from [the defendant's] own mouth.' " (*People v. Badgett* (1995) 10 Cal.4th 330, 346.) As a matter of constitutional due process, the government is obligated to honor its promises of immunity that are used to elicit incriminating statements from a defendant. (*People v. Quartermain* (1997) 16 Cal. 4th 600, 620.) Further, even without a use-immunity promise, by operation of law statements made during plea negotiations are immunized from use at trial if the case is not resolved by a plea agreement. (*People v. Tanner* (1975) 45 Cal. App.3d 345, 350-352; *People v. Scheller* (2006) 136 Cal. App.4th 1143, 1149; *United States v. Ventura-Cruel* (1st Cir. 2003) 356 F.3d 55, 63-64; Pen.Code, FN10 § 1192.4; *see People v. Macias* (1997) 16 Cal.4th 739, 750.)

FN10. Subsequent statutory references are to the Penal Code.

As recognized by pretrial counsel in his habeas declaration, there were no assurances of immunity during the April 18, 2008 crime scene interview. The immunity agreement reached at the June 29, 2007 use-immunity meeting did not apply because the agreement only referenced statements made during this use-immunity meeting. Also, the plea negotiations immunity did not apply because the interview was not in the context of formal negotiations with the district attorney, and Agent Vitkosky did not hold himself out as authorized by the district attorney to conduct plea negotiations. (*See People v. Magana* (1993) 17 Cal. App.4th 1371, 1376 [plea negotiations immunity requires "bona fide plea negotiations"]; *People v. Posten* (1980) 108 Cal. App.3d 633, 648; *People v. Cummings, supra,* 4 Cal.4th at pp. 1317-1318.)

Although Greene's and her counsel's admissions to the investigating agent could have incurred favor with the district attorney's office and increased the chances of a plea offer, if no plea agreement was reached (or if, as here, the plea agreement was set aside) these admissions would operate to her detriment at trial. To protect Greene's no self-incrimination privilege, reasonably competent counsel would have advised her to make no admissions (and would not have made admissions on her behalf) unless there was an express promise of use immunity and/or the district attorney was brought into the process so as to trigger the plea negotiations immunity.

In a related argument, Greene asserts that her pretrial counsel's conduct during the crime scene interview violated her right to attorney-client confidentiality. Given our holding based on counsel's failure to protect her privilege against self-incrimination, we need not discuss this additional ground for her ineffective representation claim. FN11

FN11. Greene also argues that her trial counsel was ineffective for failing to object to the admission of her and/or her pretrial counsel's incriminating statements during the crime scene interview. We need not discuss this contention because

assuming trial counsel's ineffectiveness in this regard, the question of reversal rests on the same issue of prejudice applying to pretrial counsel's ineffectiveness.

Additionally, Greene asserts her trial counsel was ineffective for failing to submit to the court a limiting instruction telling the jury not to consider pretrial counsel's incriminating statements made during the crime scene interview. In her habeas declaration, Greene's trial counsel states that she forgot to draft the limiting instruction. However, the trial record shows that Greene's trial counsel at one point requested such a limiting instruction, but then later recognized it was not appropriate once the trial court permitted pretrial counsel's statements to be submitted to the jury for consideration as adoptive admissions. In any event, this contention is rendered moot by our holding that with competent representation the admissions made by Greene and her pretrial counsel would have been immunized from use at trial.

## 3. NO PREJUDICE

To prevail on a claim of ineffective representation, the defendant must establish that there is a reasonable probability that absent counsel's deficiency the result would have been different. (*People v. Weaver* (2001) 26 Cal. 4th 876, 925.) If pretrial counsel had advised Greene not to make unprotected admissions and had himself made no admissions on her behalf, the prosecutor would not have had the admissions available for use as substantive evidence of her guilt at trial. Accordingly, the question of prejudice turns on whether there is a reasonable probability the jury would not have found Greene guilty if it had not been presented with her and her counsel's admissions to the investigating agent. The record shows no such reasonable probability.

Lynch testified that: Greene was driving the car on the night of the murder; all persons in the car (including he and Greene) agreed to go out and commit street robberies; and Greene provided a gun to use in the robberies. Although Lynch was an accomplice, his testimony was not suspect in the sense that he shifted blame away from himself and onto Greene. Rather, he described himself as being equally, if not more, culpable because he actually accompanied Watson to the scene of the robbery while Greene waited in the car. Further, in the year that the murder was committed, Lynch had made a consistent statement to his friend Holmes that he, Greene, and Watson were out stealing purses. Lynch's statements were corroborated by McGuire, who testified that Greene told him they were out looking for people to rob, she gave them the gun, and "they did what they did." Additionally, the prosecution's evidence showing Greene owned a gun that could have fired the caliber of bullet used during the shooting further corroborated the witness testimony that Greene supplied the gun and was a participant in the robbery endeavor.

Given Lynch's consistent statements that Greene was part of the plan to commit the robberies, which statements were independently corroborated by Greene's admissions to McGuire and the gun owner-ship evidence, there is no reasonable probability the jury would not have found guilt under a felony murder theory if it had not heard the admissions during the crime scene interview.

To support her claim of prejudice, Greene notes that in closing arguments to the jury the prosecutor replayed portions of the taped crime scene interview and emphasized that the statements made by her and her counsel during the interview showed she knew about the robberies. Although these statements supported this inference, the jury was presented with strong evidence on this same point from Lynch's and McGuire's testimony. The admissions by Greene and her counsel were

merely cumulative evidence on the issue of Greene's knowledge.

Greene also asserts that the outcome of her trial was prejudiced because the evidence showing her own counsel concluded she knew about the robberies would have had a heavy influence on the jury and provided evidence that was devastating to her defense. However, Lynch's and McGuire's testimony was likewise devastating to the defense. Given the strength of the evidence of guilt apart from pretrial counsel's admissions on Greene's behalf, there is no reasonable probability the jury would have reached a different verdict had it not heard counsel's incriminating statements.

We reach the same conclusion even if we apply the harmless-beyond-a-reasonable-doubt standard for federal constitutional error based on counsel's failure to protect Greene's privilege against self-incrimination. (*See People v. Huggins* (2006) 38 Cal.4th 175, 249; *People v. Carpenter* (1997) 15 Cal.4th 312, 412.) Given the compelling force of the evidence from Lynch and McGuire that Greene was a participant in the robbery activity, we have no doubt the jury would have found her guilty even without the crime scene admissions.

Lodgment 12 at 15-20.

Petitioner is not entitled to federal habeas relief for her claim of ineffective assistance of counsel relating to her statements and to the statements that were used as adoptive admissions at trial, both of which were made during the crime scene interview.  Under clearly established federal law, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).  To prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  Id. at 687.  The proper measure of attorney performance is "simply reasonableness under prevailing professional norms."  Id. at 688.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  Id. at 689-690.  To determine whether errors of counsel prejudiced the defense, a court "must consider the totality of the evidence before the judge or jury" and consider whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Id. at 696.  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to

1  make a sufficient showing of either one.  Id. at 697.

2      Here, Petitioner has failed to demonstrate that she was prejudiced by her counsel's

3  performance.  After considering the totality of the evidence, this Court finds that Petitioner has

4  not shown that the jury would have reached a different outcome had the prosecutor been unable

5  to use Petitioner's admissions and the admissions of Petitioner's counsel made to the

6  investigating agent during Petitioner's crime scene interview.

7      Petitioner's crime scene interview was recorded in its entirety with a digital audio recorder

8  and, in some instances, with both the audio recorder and a video recorder.  Lodgment 3 at

9  1115-1116.  While it is unclear which specific portions of the video and audio recordings were

10  played for the jury [see lodgment 3 at 1119 (stating "review of audiotape; unreported) and 1402

11  (stating "there is a stipulation that the recordings that are being played do not need to be

12  reported")], the Court has reviewed the transcripts and has interpreted counsel's and Petitioner's

13  statements in the light most favorable to Petitioner.  In the transcripts, Petitioner and her

14  attorney admit that on the night the victim was murdered, Petitioner got into her car with Khary

15  Watson, Katrel Lynch, and Alfonzo Frazier and drove around town.  Lodgment 2 at 145.  The

16  group eventually found themselves at 36th and Meade where Petitioner stopped the car so that

17  Katrel and Khary could exit.  Id. at 154.  Petitioner waited for the two men who left to attempt

18  a robbery.  Id.  When the men returned, they told Petitioner that they did not get anything from

19  the attempted robbery.  Id. at 155.  Petitioner then admitted to driving to another location on

20  Madison Avenue and parking again while Khary and Katrel exited the car.  Id. at 147.  While the

21  men were gone, Petitioner admits to hearing one shot.  Id. at 149.  Shortly after hearing the

22  shot, Katrel and Khary returned to the car and Katrel told Khary that he was stupid to which

23  Khary responded that he was not dumb and that he had picked up the shell and casing.  Id.

24      Petitioner's attorney stated that on the night in question, Petitioner assumed that Katrel

25  and Khary were getting out of the car to attempt robbery (although she was not aware of whom

26  the intended victims were), but that she did not provide the men with her gun or know that they

27  were armed.  Id. at 168-169.  Petitioner also admits to knowing that Katrel and Khary were "up

28  to no good" and that she did not know for certain, but did assume Katrel and Khary  were going

to rob somebody.  Id. at 170-172.  Petitioner further admits to seeing a news story about the victim the next day and wanting to send flowers to her family, but refraining because Katrel or Khary told her that it was a stupid idea and would lead to everyone getting caught.  Id. at 181. Finally, Petitioner admits to getting the gun back and giving it to Maurice McGuire to sell.  Id. at 182.

Assuming these statements were improperly obtained and presented, the issue before this Court is whether the jury would have reached a different outcome without hearing these statements.  Strickland, 466 U.S. at 696.  To make this determination, the Court must consider the totality of the other evidence presented to the jury.  Id.

Petitioner was not prejudiced by the admissions that she and her counsel made during the crime scene interview because almost all of the same information was presented to the jury via other witnesses.  Specifically, Petitioner's ex-boyfriend and the father of her child, Maurice McGuire, testified that Petitioner would cry every time she heard a news report about a woman who was shot on El Cajon Boulevard.  Lodgment 3 at 817, 821.  He further testified that Petitioner told him that on the night the woman was killed, Petitioner was driving around with Katrel and "some other dude" looking for people to rob.  Id. at 819.  Petitioner admitted that the men had a gun, but claimed that she "did not know nothing about the murder until she got back to Spring Valley."  Id. at 823-826.

Tyrone Katrel Lynch testified that on October 1, 1994, he was at Petitioner's house with Khary Watson and Alfonzo Frazier.  The four of them were discussing the fact that it was payday and they did not have any money so they all decided to go rob some people.  Id. at 886-888. Mr. Lynch explained that the four of them got into Petitioner's car and drove around looking for people to rob with Petitioner's gun.  Id. at 891.  Mr. Lynch was aware of the gun because there was a discussion about the gun with the group, all though he did not say what that discussion entailed.  Id.  Mr. Lynch testified that Petitioner usually kept the gun on her person, but that he could not recall who was holding the gun when they were driving around preparing to rob people because the gun was passed around.  Id. at 891-892.  He did recall that Khary was holding the

12CV1824-BEN (BLM)

gun when the victim was shot, but did not know how the gun got into Khary's hands.[3]  Id.  Mr.
Lynch further testified that the group attempted two different robberies that evening and that
before Khary left the car for the first robbery, the group discussed what was about to happen.
Id. at 898.  Specifically, in response to the question "was it discussed what he was going to do
when he got out of the car," Mr. Lynch responded "yes, it was discussed."  Id.  He then stated
that everybody in the car knew and that the group discussed Khary pointing the gun at people
to make the robbery easier.  Id. at 894, 898.  Because they only got $6.00 from the first robbery,
My Lynch testified that the group decided to drive to another location and find someone else to
rob.  Id. at 899-903.  It was during this second robbery that the victim was killed.  After the
shooting, Mr. Lynch and Khary returned to the car with a pouch that they had taken from one
of the victims.  Id. at 915.  Mr. Lynch testified that Petitioner searched the pouch herself because
she did not believe it when Khary said that there was nothing in the pouch.  Id. at 915.  He also
testified that Petitioner asked Khary why he shot the victim and that Petitioner got her gun back
from Khary.  Id. at 916, 920.

In sum, the jury was presented with the same information contained in the admissions
of Petitioner and her counsel from two different witnesses, Mr. McGuire and Mr. Lynch.  Mr.
McGuire's testimony was consistent with the testimony provided by Mr. Lynch and supports the
conclusion that Petitioner got into her car with three other people and a gun, intending to drive
around town and rob people in order to collect some extra money, and it resulted in a person
being shot and killed.  It also supports this Court's conclusion that the jury would have reached
the same conclusion with or without the admissions of Plaintiff and her counsel.

Because the Court finds that the jury would have reached the same conclusion without
the admissions of Petitioner and her counsel, Petitioner's claim of ineffective assistance of
counsel resulting from her trial counsel's failure (1) to object to the admissions, (2) move to
exclude or limit the admissions, or (3) submit a jury instruction telling the jury to disregard the

---

[3]Specifically, Mr. Lynch stated that he did not know "if [Petitioner] gave [him] the gun or she gave it to
[Khary]."  And, in response to the question "you could have given the gun to Mr. Watson; is that your testimony,"
Mr. Lynch responded "yes," but that he really didn't know for sure.  Id. at 894-895.

admissions, does not warrant federal habeas relief.  As explained, the statements did not result in any prejudice to Petitioner.  Accordingly, the failure of counsel to object to those statements also did not result in any prejudice to Petitioner and, therefore, does not constitute ineffective assistance of counsel for purposes of federal habeas relief.

The state court's analysis and decision denying Petitioner's ineffective assistance of counsel claim was not "contrary to, or, an unreasonable application of clearly established Federal law."  28 U.S.C. § 2254(d)(1).  For these reasons, this Court finds Petitioner's ineffective assistance of counsel claim due to the admissions of Petitioner and her counsel to be without merit and **RECOMMENDS** that Petitioner's Petition be **DENIED** on ground one.

> 2.  <u>Failure to Limit Evidence Derived from Petitioner During Her "Free Talk Agreement"</u>

Petitioner contends that she was denied effective assistance of counsel and due process when evidence derived from her "free talk agreement" was used against her at trial.  Pet. at 8.  Petitioner argues that her trial counsel's failure to object to this evidence constituted ineffective assistance of counsel and prejudiced her at trial.  <u>Id.</u> at 17-18.

Respondent contends that no immunity was conferred through Petitioner's meeting agreement and that even if it was, Petitioner was not prejudiced.  Answer at 15.

Petitioner raised this claim in the petition for review she filed in the California Supreme Court, which denied the petition without citation of authority.  Lodgments 13 & 14.  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  <u>Ylst</u>, 501 U.S. at 801-06.  That court analyzed the claim as follows:

> Greene asserts that her trial counsel provided ineffective representation because counsel failed to move to exclude evidence derived from the information Greene provided during the June 29, 2007 use-immunity meeting.
>
> A use-immunity promise can be both direct and derivative; direct use immunity prohibits use of the defendant's statements themselves, and derivative use immunity prohibits use of evidence derived from the defendant's statements. (*United States v. Smith* (4th Cir.2006) 452 F.3d 323, 336-337; *United States v. Kilroy* (D.D.C.1994) 27 F.3d 679, 685; *United States v. Plummer* (9th Cir.1991) 941 F.2d 799, 803.) When an immunity promise is contained in an agreement between the parties, the scope of the immunity is defined by contractual principles. (*United States v. Smith*, supra, 452 F.3d at p. 337; *United States v. Cantu* (5th Cir.1999) 185 F.3d 298, 302.)
>
> If derivative use immunity is promised, the prosecution may only introduce

evidence that was obtained from a source independent of the defendant's statements or that would have been inevitably discovered even without the defendant's statements. (*United States v. Cantu*, supra, 185 F.3d at p. 302; *State v. Hazelwood* (Alaska 1993) 866 P.2d 827, 831-834; *Griego v. Superior Court* (2000) 80 Cal. App.4th 568, 574-575.) A defendant who challenges evidence as derivative is entitled to a hearing (known as a *Kastigar* hearing) to determine whether the prosecution can carry its burden to show by a preponderance of the evidence that the evidence is admissible under independent source or inevitable discovery principles. (*United States v. Cantu*, supra, 185 F.3d at p. 302; United States v. Schmidgall (11th Cir. 1994) 25 F.3d 1523, 1528; *State v. Hazelwood*, supra, 866 P.2d at pp. 831-834; *see Griego v. Superior Court*, supra, 80 Cal. App.4th at pp. 574-575).FN12

FN12. In *Kastigar v. United States* (1972) 406 U.S. 441, 453, the court upheld the government's power to compel a witness's self-incriminating testimony based on a statutory provision affording the witness both direct and derivative use immunity. The court noted that in any subsequent prosecution of the witness, the government had the burden to show the evidence was derived from an independent source. (*Id.* at pp. 460-461.) In cases involving noncompulsory self-incriminatory statements provided upon a grant of derivative use immunity (such as in a plea bargain or other agreement), a *Kastigar*-type hearing may also be warranted. (*United States v. Schmidgall*, supra, 25 F.3d at p. 1528, fn. 5; *United States v. Smith,* supra, 452 F.3d at p. 337; *United States v. Cantu*, supra, 185 F.3d at p. 302.) Further, the courts have applied inevitable discovery, as well as independent source, principles when evaluating whether the challenged evidence is admissible. (State v. Hazelwood, supra, 866 P.2d at pp. 831-834; United States v. Streck (6th Cir.1992) 958 F.2d 141, 145-146; *United States v. Kiser* (8th Cir.1991) 948 F.2d 418, 423; *see Griego v. Superior Court*, supra, 80 Cal. App.4th at pp. 574-575, & fn. 4.)

Greene argues that the immunity agreement provided at the June 29, 2007 use-immunity meeting promised her both direct and derivative use immunity. She asserts that because she identified Lynch and Watson at the use-immunity meeting, her trial counsel should have made a *Kastigar* motion to exclude the evidence derived from the prosecution's contacts with Lynch and Watson, including Lynch's testimony, Holmes's testimony (because Lynch led the police to Holmes), and Watson's recorded statements to Lynch while they were incarcerated (see fn. 3, ante ). In a habeas declaration from Greene's trial counsel, counsel states that at the time of Greene's trial she was not familiar with the *Kastigar* case and did not consider filing a motion on the basis of *Kastigar*.

The agreement provided at the use-immunity meeting states that the "prosecution agrees that statements made at the ... meeting by [Greene] will NOT be used against [Greene] ...." (Italics added.) To support her contention that this provision created a derivative use-immunity promise, Greene cites *Kastigar*, which holds that to compel a witness to testify in contravention of the witness's no-self-incrimination privilege, the grant of immunity must be both direct and derivative. (*Kastigar v. United States*, supra, 406 U.S. at p. 453.) Unlike the situation in *Kastigar*, Greene's statements were not compelled, but rather were voluntary pursuant to an agreement. In this circumstance, the scope of the immunity is governed by contractual principles. (*United States  v. Smith, supra*, 452 F.3d at p. 337; United States v. Cantu, supra, 185 F.3d at p. 302; *United States v. Plummer, supra*, 941 F.2d at p. 802.) Accordingly, we evaluate the terms of the agreement to determine whether it encompassed a promise of derivative use immunity.

Some courts have concluded that a promise not to use a defendant's statements

or information, by its plain terms, does not confer derivative use immunity because there is no express reference to derivative use. (*See, e.g.*, *United States v. Smith*, supra, 452 F.3d at p. 337 [promise that government will not use "any of the information" provided by defendant did not create derivative use immunity]; compare *United States v. Cantu*, supra, 185 F.3d at p. 302 [promise that government will not use information "directly or derivatively" created derivative use immunity].) In contrast, other courts have concluded that in the immunity context the term " 'use' " is ambiguous, and absent evidence of a contrary intent, the agreement should be interpreted to convey both direct and derivative use immunity. (*United States v. Plummer*, supra, 941 F.2d at p. 805; *see also United States v. Kilroy*, supra, 27 F.3d at p. 685 [promise of "use immunity" constituted term of art encompassing both direct and derivative use immunity]; cf. *People v. Vines* (2011) 51 Cal.4th 830, 882, fn. 24.)

Even if we assume arguendo that the agreement provided at the June 29, 2007 use-immunity meeting extended a promise of derivative use immunity and that Greene's counsel should have filed a *Kastigar* motion, reversal is not warranted because there is no showing of prejudice. (*See People v. Sapp* (2003) 31 Cal.4th 240, 263 [if record does not show prejudice, court may reject claim of ineffective assistance without determining whether counsel's performance was deficient].)

The record shows the authorities received information identifying Lynch as a suspect and directing them to where he was living from sources other than the information provided by Greene at the use-immunity meeting. In the anonymous phone call received in 2006, McGuire provided Lynch's name (albeit with an incorrect first name for both Lynch and his brother) and stated that Lynch was a suspect. Thereafter, on June 5, 2007 (before the June 29 use-immunity meeting), Greene voluntarily went to the police department in response to the phone call from the police. At this time she provided the police with the Lynch brothers' correct names and stated they lived in Albuquerque, New Mexico. The June 5 police report reflects that the police then identified both Lynch brothers by their Social Security numbers, and additionally acquired law enforcement identification numbers and the date of birth for Terrence. There is no contention that the authorities were restricted from making full use of whatever information Greene provided during the June 5 police station meeting.

Subsequently, at the June 29 use-immunity meeting, Greene again talked about the Lynch brothers and the fact that they lived in New Mexico; stated that Terrence's address could be obtained from the child support division; clarified that Terrence was not involved in the crime; and described Lynch's involvement. Based on the information acquired from McGuire (identifying Lynch as a suspect) and from Greene at the June 5 police station meeting (providing Lynch's correct name and the city where he was living), the police obtained identifying information for Lynch (including his Social Security number) and knew he was person who should be contacted as a suspect. Given this identification of Lynch before the June 29 use-immunity meeting, we have no doubt the police would have found and interviewed Lynch even if they had not received additional information from Greene at the subsequent use-immunity meeting. Based on independent source and inevitable discovery principles, the prosecution was entitled to present Lynch's testimony and any evidence obtained via Lynch, including Holmes's testimony.

FN13 Likewise, to the extent Greene's statements at the use-immunity meeting led the police to Watson, Watson's identity also would have been discovered through the police contact with Lynch. FN14

FN13. We note that in her habeas petition, Greene discusses independent source, but not inevitable discovery, principles. The inevitable discovery rule is " 'an extrapolation from the independent source doctrine: Since the ... evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' " (*People v. Robles* (2000) 23 Cal.4th 789, 800, italics omitted.) As noted, inevitable discovery principles properly apply here (see fn. 12, ante ), and in any event, the police independently obtained Lynch's name from McGuire and from the June 5 police station interview.

FN14. Green only provided Watson's first name at the use-immunity meeting; thus it appears Watson's identity may have been determined for the first time through the interview with Lynch.

Because there is no reasonable probability the defense would have prevailed at a *Kastigar* hearing, Greene's claim of ineffective representation on this ground is unavailing. FN15

FN15. To the extent Greene contends (independent of her ineffective representation claim) that the admission of evidence derived from the use-immunity meeting violated her due process rights, this claim is forfeited on appeal because her trial counsel did not object to admission of the evidence at trial. (*People v. Hollinquest* (2010) 190 Cal. App.4th 1534, 1554.) In any event, even if we were to reach the due process issue directly on its merits, our conclusion would be the same based on the clear showing that the authorities acquired information about Lynch from sources other than the matters provided by Greene during the use-immunity meeting.

Lodgment 12 at 21-26.

Petitioner's claim of ineffective assistance of counsel due to her counsel's failure to limit evidence derived from Petitioner during her "free talk" also fails to satisfy the standard for federal habeas relief.  As discussed above, for habeas relief, Petitioner must show that her counsel's performance was deficient and that the deficient performance prejudiced her defense.  Strickland, 466 U.S. at 687.  Even assuming that counsel's failure to request a Kastigar hearing or move to suppress the evidence constitutes ineffective assistance of counsel, Petitioner's claim fails because she cannot establish prejudice.

On November 2, 2006, Maurice McGuire placed an anonymous call to police informing them that he knew something about a shooting that took place around El Cajon Boulevard in October 1994.  Lodgment 2 at 76, Lodgment 3 at 828, 1057.  During that call, Mr. McGuire named Petitioner and stated that she was involved in the killing along with Terry and Terrell Lynch.  Lodgment 2 at 81.

On June 5, 2007, Petitioner met with authorities to discuss her involvement in the murder

of Patricia Lopez. Lodgment 3 at 1107, 1408. During that meeting, Petitioner revealed that she did not know anything about her gun being used in a homicide on October 1, 1994 and that her gun had been missing. Lodgment 7, Exhibit F at 37. She also stated that the only other person who had access to the gun was Terrence "Terry" Lynch and that Terry had a brother named Katrel Lynch. Id. She shared that Terry Lynch was the father of her daughter Tyarri Lynch and that he and Katrel had moved to Albuquerque, New Mexico when their mother died. Id. at 35.

On June 29, 2007, Petitioner met with authorities again. Lodgment 7 at 11. Prior to answering any questions, Petitioner entered into a "free talk agreement" which stated that:

> Use of CI statements for Impeachment: The prosecution agrees that statements made at the initial meeting by PCI will NOT be used against PCI but may be used as impeachment against the PCI in any manner after the initial meeting, should PCI's testimony at any time be inconsistent with the statements made by the PCI at the initial meeting.

Id. The agreement was signed by Petitioner's attorney Mr. Schwartz, Agents Vitkosky and Agnew, and Deputy District Attorney Jeff Dusek. Id.

Immunity issues often arise when the government seeks to compel testimony from a defendant who raises his or her Fifth Amendment right against self-incrimination. United States v. Dudden, 65 F. 3d 1461, 1467 (9th Cir. 1995). In those instances, use and derivative use immunity is granted under 18 U.S.C. § 6002. Id. Use immunity means that compelled testimony from a defendant cannot be used against that defendant and derivative use immunity means that the government is required to derive all information about the criminal activity from sources "wholly independent of the statements made in the interview." Id. (citing United States v. Plummer, 941 F.2d 799, 802 (9th Cir. 1991)). Here, Petitioner was not forced to testify and her promised immunity was the result of the "free talk" agreement, not statutory. In this scenario, the courts have concluded that immunity agreements are to be interpreted using "ordinary contract principles." Id.

Regardless of whether immunity is granted by statute or by informal agreement, the government has the burden "to prove that any evidence it intends to use against the defendant is derived from a legitimate source independent of the immunized statement." Id. at 1468 (citing Kastigar v. United States, 406 U.S. 441, 453 (1972) and United States v. Camp, 58 F.3d 491, 493

1    (9th Cir. 1995)).  The government must prove the independent nature of its sources before trial

2    by a preponderance of the evidence and a <u>Kastigar</u> hearing is usually required to determine if

3    the government has met its burden.  <u>Id.</u>  (citing <u>Kastigar</u>, 406 U.S. at 460).

4          It is not totally clear from her Petition what information Petitioner feels was derived from

5    her "free talk" with Agents Vitkosy and Agnew as opposed to other sources, although it appears

6    that she is concerned with the identification of Katrel Lynch and Khary Watson.  Pet. at 18.

7    While Petitioner did provide additional detail during her "free talk," it cannot be concluded that

8    the identities of Mr. Lynch and Mr. Watson were derived from Petitioner's "free talk" or that the

9    investigating agents would not have found Mr. Lynch and Mr. Watson without Petitioner's "free

10   talk."  Instead, the record shows that Mr. Lynch's name was initially brought to the attention of

11   authorities during the anonymous call from Mr. McGuire.  Lodgment 2 at 76.  While Mr. McGuire

12   did get Katrel Lynch's name incorrect, he did correctly name the father of Petitioner's child and

13   the brother of Katrel Lynch, making it easy for authorities to derive the name and location of

14   Katrel Lynch.  <u>Id.</u>  Additionally, prior to her "free talk" with the investigating agents, Petitioner

15   herself met with the agents and provided them with the names of Katrel and Terrence "Terry"

16   Lynch along with their location at the time.  Lodgment 7 at, Exhibit F at 35. Given the fact that

17   police had the name and location of Katrel Lynch prior to Petitioner's "free talk," and that Katrel

18   provided agents with the name of Khary Watson [lodgment 3 at 1077], Petitioner has failed to

19   demonstrate that she was prejudiced by the use of information derived from her "free talk."

20   From the evidence in the record, it seems very likely that had Petitioner's counsel held a <u>Kastigar</u>

21   hearing to object to the evidence, the government would have satisfied its burden.  Lodgment

22   2 at 75, Lodgment 3 at 107 and Lodgment 7 at Exhibit F at 35.

23         Petitioner appears to focus on the fact that Agent Vitkosky did not interview Katrel Lynch

24   or Maurice McGurie until well after her "free talk" meeting with authorities.  Pet. at 18.  However,

25   the timing of the actual interview is not important given that Agent Vitkosky was aware of the

26   men as a result of information obtained prior to Petitioner's talk.  Because the investigating

27   agents were aware of Katrel Lynch and Khary Watson from sources "wholly independent of the

28   statements made in the [free talk] interview," and Petitioner's counsel could not have

successfully objected to admitting the evidence related to Mr. Lynch and Mr. Watson, Petitioner fails to satisfy the second prong of the <u>Strickland</u> test and show that she was prejudiced by her counsel's deficient performance and, therefore, entitled to federal habeas relief on this claim. <u>Dudden</u>, 65 F. 3d at 1467.

Accordingly, this Court **RECOMMENDS** that Petitioner's second ineffective assistance of counsel claim for habeas relief be **DENIED**.

**B.      Prosecutorial Misconduct**

Petitioner argues that she was denied due process and her right to a fair trial due to prosecutorial misconduct.  Pet. at 7.  Specifically, Petitioner alleges that the prosecutor erred when he told the jury during closing arguments that Petitioner "did not NEED to intend that a robbery be committed in order to be convicted of felony murder."  <u>Id.</u>  According to Petitioner, this misstatement of the law prejudiced her because it "relieved the jury from resolving an element of aiding and abetting," which was the "key issue in the case."  <u>Id.</u> at 15.

Respondent contends that Petitioner's claim lacks merit because Petitioner "failed to meet her burden of proving that the California Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  Answer at 20.

Petitioner raised this claim in the petition for review she filed in the California Supreme Court, which denied the petition without citation of authority.  Lodgments 13 & 14.  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  <u>Ylst</u>, 501 U.S. at 801-06.  That court analyzed the claim as follows:

> Greene argues the judgment must be reversed because in closing argument to the jury, the prosecutor erroneously told the jury that she did not need to intend to commit the robbery to be culpable as an aider and abettor.
>
> To be culpable as an aider and abettor, the defendant must have acted "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.) The aider and abettor is liable for (1) the offense committed by the perpetrator that was intended by the aider and abettor (the target offense), and (2) other offenses committed by the perpetrator that were not intended by the aider and abettor but that were the

natural and probable consequence of the intended offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-261; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) With respect to the target offense intended by the aider and abettor, the aider and abettor's mens rea (like the perpetrator's mens rea) is the intent associated with the target offense. (*People v. McCoy*, supra, 25 Cal.4th at p. 1118 & fn. 1.) In contrast, with respect to a nontarget offense unintended by the aider and abettor, the aider and abettor (unlike the perpetrator) need not have the mens rea required for the offense, but need only have the overarching "intent to encourage and bring about conduct that is criminal...." (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123.)

The courts have repeatedly recognized the need for common intent of the perpetrator and aider and abettor in the context of culpability for the target offense. (*See*, e.g., *People v. Durham* (1969) 70 Cal.2d 171, 181 [the aider and abettor " 'must share the criminal intent with which the crime was committed' "; *People v. Prettyman*, supra, 14 Cal.4th at p. 259 ["When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator' "]; *People v. McCoy*, supra, 25 Cal.4th at p. 1118, fn. 1 ["when guilt is not predicated on the natural and probable consequences doctrine, the aider and abettor must, indeed, share the actual perpetrator's intent"]; accord *People v. Lee* (2003) 31 Cal.4th 613, 624; *People v. Beeman*, supra, 35 Cal.3d at p. 560.)

During closing argument, the prosecutor told the jury that to convict based on aiding and abetting, the defendant must know the perpetrator intends to commit the crime and must intend to help in the commission of the crime, but the defendant need not intend to commit the crime; i.e., the defendant did not have to "intend to commit the robbery." The prosecutor elaborated that although the evidence showed Greene "was signed up wholeheartedly for these robberies, [and] that she intended to commit the robbery, [she] doesn't have to intend to deprive somebody of their property permanently through force or fear" as long as she intended to aid someone who was going to commit the robbery with knowledge of the person's unlawful purpose. During rebuttal closing argument, the prosecutor responded to defense counsel's argument that Greene needed to "share the same intent" as the robbers by stating, "I respectfully disagree with the fact that the defendant had to share the companion's intent to commit a robbery. I'd submit to you, as I did before, that that's what in fact happened here. All she has to intend to do is aid and abet them in a robbery with knowledge that they're about to commit a robbery. She doesn't have to intend to want to take property."

We agree with Greene that the prosecutor misstated the law. Portions of the prosecutor's closing argument were contrary to the principle that an aider and abettor needs to share the perpetrator's intent to commit the target offense. Thus, to be liable as an aider and abettor of robbery, Greene needed to share the perpetrator's intent to commit a robbery.

However, we conclude there was no prejudice because there is no reasonable probability the result would have been different without the improper argument. (*People v. Harrison* (2005) 35 Cal.4th 208, 244.) FN16 The jury was instructed that to be culpable on an aiding and abetting theory, the defendant must know the perpetrator intends to commit the crime (i.e., the robbery) and must intend to aid the perpetrator in committing that crime. (*See* CALCRIM No. 401.) The prosecutor's closing arguments likewise stated that Greene had to intend to help with the robbery. Once the jury found Greene knew her accomplices intended to commit a robbery and that she intended to help them commit it, the conclusion is virtually inescapable that she wanted the robbery to occur; i.e., that she shared their intent

to commit robbery. Indeed, it is difficult to imagine a scenario where a defendant who wants to facilitate the commission of a crime does not also want the crime to happen. We presume the jury followed the trial court's instructions. (*People v. Gray* (2005) 37 Cal.4th 168, 217.) We have no doubt the jury's finding that Greene intended to help with the robbery encompassed a finding that she shared the intent to commit the robbery.

FN16. Given our finding of no prejudice, we need not address the Attorney General's contention that Greene's challenge to the prosecutor's closing argument is forfeited based on defense counsel's failure to object.

We note further that this case did not involve an allegation of aiding and abetting culpability for murder as a target offense or as a natural and probable consequence of a target offense. Rather, given the applicability of the felony-murder rule, Greene was guilty of the shooting if she merely aided and abetted the robbery. (*See People v. Dominguez* (2006) 39 Cal.4th 1141, 1158-1159.) Thus, the prosecutor's incorrect statement concerning the intent for aiding and abetting was confined to the robbery issue, and did not otherwise impact the murder issue.

Lodgment 12 at 27-30.

Petitioner is not entitled to federal habeas relief due to the prosecutor's misstatement of the law during closing arguments. "Improper argument does not, per se, violate a defendant's constitutional rights." Hill v. Stolc, 2009 WL 4730842, *16, (W.D. Wash. Dec. 4, 2009) (quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993)). When a prosecutor's conduct is placed in question, the standard of review is the "narrow one of due process, and not the broad exercise of supervisory power." Hill, 2009 WL 4730842 at *4, (quoting Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000). "A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair." Garcia v. Horel, 2009 WL 4510141, *4 (N.D. Cal. Nov. 30, 2009) (citing Darden v. Wainwright, 477 U.S. 168, 182-83 (1986) and Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor")). Habeas relief only will be granted where Petitioner demonstrates that the prosecutorial misconduct resulted in actual prejudice, which occurs when the misconduct has a "substantial and injurious effect or influence in determining the jury's verdict." See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

This Court must look at the trial as a whole and place the prosecutor's remarks in context. Boyde v. California, 494 U.S. 370, 384 (1990); Greer v. Miller, 483 U.S. 756, 765-66 (1987). At

1    Petitioner's trial, the prosecutor's misstatements occurred during closing arguments.  Lodgment

2    3 at 1492-1530.   Prosecutorial misstatements during closing arguments are generally less

3    harmful to the trial because they can be corrected by court instruction, which carries more

4    weight.  Boyde, 494 U.S. at 384.   As the Supreme Court concisely stated:

5           [A]rguments of counsel generally carry less weight with a jury than do instructions
            from the court.  The former are usually billed in advance to the jury as matters of
6           argument, not evidence, and are likely viewed as the statements of advocates; the
            latter, we have often recognized, are viewed as definitive and binding statements
7           of the law.  Arguments of counsel which misstate the law are subject to objection
            and to correction by the court.   This is not to say that prosecutorial
8           misrepresentations may never have a decisive effect on the jury, but only that they
            are not to be judged as having the same force as an instruction from the court.
9

10   Id. at 384-85 (internal citations omitted).   This Court must nevertheless grant habeas relief

11   where the prosecutor's misstatements "had substantial and injurious effect or influence in

12   determining the jury's verdict."   Ortiz-Sandoval, 81 F.3d at 899.  If left with "grave doubt"

13   whether the error had substantial influence over the verdict, this Court must grant relief.   Id.

14         Having reviewed the trial transcript and other lodgments in this case, this Court finds that

15   the prosecutor's misstatements of the law, while improper, could not have had substantial and

16   injurious effect or influence in determining the jury's verdict and thus did not deprive Petitioner

17   of a fair trial.

18         During closing arguments of Petitioner's trial, the prosecutor stated:

19          Note here that the Defendant does not have to intend to commit the underlying
            crime.  They don't have to intend to commit the robbery.  The intent is to aid or
20          assist the companion with knowledge of the companion's unlawful purpose along
            with conduct that does in fact aid or assist the companion.  That's all that is
21          required for aiding and abetting.

22   Lodgment 3 at 1492. Later the prosecutor reiterated his point by stating:

23          And I respectfully disagree with the fact that the Defendant has to share the
            companion's intent to commit a robbery.  I'd submit to you, as I did before, hat
24          that's what in fact happened here.  All she has to intend to do is aid and abet them
            in a robbery with knowledge that they're about to commit a robbery.  She doesn't
25          have to intend to want to take property.

26   Id. at 1529-1530.  The prosecutor's comments were made in the context of closing arguments.

27   [lodgment 3 at 1492, 1529-1530] and prior to the prosecutor's closing argument, the trial court

28   judge properly instructed the jury on the law of aiding and abetting.   Id. at 1470.   Those

instructions included the following:

A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator who directly committed the crime.  A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.

To prove that defendant is guilty of a crime based on aiding and abetting that crime, the people must prove that: 1, the perpetrator committed the crime; 2, the defendant knew that the perpetrator intended to commit the crime; 3, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and 4, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of the crime or fails to prevent the crime does not by itself make him or her an aider and abettor.

The defendant is charged with murder under theory of felony murder.  The defendant may be guilty of murder under a theory of felony murder even if another person did the act that resulted in the death.  I will call the other person the perpetrator.

To prove that the defendant is guilty of first degree murder under this theory, the people must prove that: 1, the defendant aided and abetted the perpetrator in committing or attempting to commit a robbery; 2, the defendant aided . . . The defendant intended to aid and abet the perpetrator in committing a robbery; 3, if the defendant did not personally commit or attempt to commit a robbery, then a perpetrator whom the defendant was aiding and abetting personally committed or attempted to commit a robbery, the perpetrator did an act that caused the death of another person.

A person may be guilty of felony murder even if the killing was unintentional, accidental or negligent.  To decide whether the perpetrator committed or attempted to commit a robbery, please refer to the separate instruction I will give you on that crime.

To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I have given you on aiding and abetting.  You must apply those instructions when you decide whether the people have proved first degree murder under a theory of felony murder.

12CV1824-BEN (BLM)

> The defendant must have intended to commit or aid and abet the felony of robbery before or at the time of the act causing death.  It is not required that the person killed be the victim or intended victim of the felony.  It is not required that the defendant be present when the death occurs.
>
> To prove the defendant aided and abetted the perpetrator in committing or attempting to commit a robbery, the people must prove that the perpetrator: 1, took or attempted to take property that was not his own, 2, the property was taken or attempted to be taken from another person's possession and immediate presence; 3, the property was taken or attempted to be taken against the other person's will; 4, the perpetrator used force or fear to take or attempt to take the property, or to prevent the other person from resisting; and 5, when the perpetrator used force or fear to take or attempt to take the property, he intended to deprive the owner of it permanently.

Id. at 1481-1484.  Petitioner does not challenge the accuracy of the court's instructions.  Pet. The court provided each juror with a packet of instructions to bring into deliberations.  Lodgment 3 at 1470.  In addition, the jury was instructed that "if [they] believe[d] that the [prosecutor's] comments on the law conflict[ed] with [the judge's] instructions, [they] must follow [the judge's] instructions."  Lodgment 3 at 1471.

As Petitioner provides no evidence to the contrary, this Court must presume that the jury followed the court's instructions and based its verdict on the correct law of aiding and abetting despite the prosecutor's misstatement.  See Greer, 483 U.S. at 767 n.8. (assuming the jury followed the court's curative instructions to disregard inadmissible evidence inadvertently presented to it when there was not an "overwhelming possibility" that the jury would be unable to follow the court's instructions); see also Ortiz-Sandoval, 81 F.3d at 899-900.  Looking at the trial as a whole, this Court finds that the California Court of Appeal was reasonable in deciding that the prosecutor's misstatements did not deprive Petitioner of a fair trial.  Accordingly, this Court **RECOMMENDS** that Petitioner's third ground for habeas relief be **DENIED**.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS ORDERED** that no later than **February 25, 2013**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be

captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later that **March 11, 2013**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**


DATED:  February 4, 2013

                                        Barbara Major
                                        _____
                                        BARBARA L. MAJOR
                                        United States Magistrate Judge

12CV1824-BEN (BLM)